May it please the Court, my name is Tom Woodbury, representing the appellants in this case. Put the mic up a little, would you? I'm sorry? Put the mic up a little. Is that better? That'll do it better. Okay. Okay. I'll try to speak up again, Your Honors. In this case And then just to be sure, this is the Gemtown Project case, correct? This is the Gemtown, which can be distinguished from the next case by the lack of an EIS. Okay. So in this case, the question is whether there are significant issues that have been raised concerning the scope of impact. There's no dispute in this case that there will be adverse impacts of the thinning project on the resident Gemtown goshawks. The Forest Service found that the project may impact individuals or habitat by rendering the project area less suitable as goshawk foraging habitat. And that was actually before the fire burned, which rendered the project area even less suitable as goshawk foraging habitat. But there is no disclosure anywhere in the record concerning the pre- and post-project habitat suitability for the goshawk, specifically in spite of repeated requests and analysis of canopy closure, which is critical to the goshawk for purposes of maintaining prey abundance. The goshawk is a unique species in that it is pretty determined to stay pretty loyal to its territory. But if there's not enough prey base, in this case primarily red squirrels, then it won't reproduce anymore. So it will just eventually go extinct or be extirpated from that territory. And the Forest Service found also that Gemtown goshawks may find it more difficult to forage due to the sharp decline in red squirrel populations and increased competition from the other hawks and owls, which benefit from the thinning. Now, you're reading now from what document? Those findings are contained either in the biological evaluation for the project, I think, and the biological evaluation and the EA. The dispute then becomes what is the significance of these adverse impacts on goshawk viability? The Forest Service repeatedly referenced in the environmental assessment and briefing, et cetera, that there would be no significant impact because they had done this type of logging before, north of the project area and the bulls run and sweat skelch drainages without any significant impact. Nowhere in that analysis, however, will you find any specific, any detailed analysis of the impacts on those goshawks. And in fact, it wasn't until they supplemented the record after the fire burned during litigation that the monitoring information was presented for the first time to the public. And according to that information, in fact, those goshawks had been extirpated from the drainages that were locked. The sweats gulch goshawks apparently were extirpated. They were never seen again. Where is that? The bull sweats? The sweats gulch is to the north and west of the project area. This is all in the cumulative effects analysis area. And the bulls run is to the north and east of the project area. I mean, you know, I guess this is where you ask the court to kind of fly spec the analysis, because I thought they said that there wasn't evidence that there had been an abandonment. There may have been a shifting. Well, with reference to the sweats gulch territory, it was abandoned. There was no there's no more. They've not seen any goshawks. They know that the nest itself is no longer being used because they've monitored it. And there haven't been any other sightings of goshawks in that area. And the bulls run. By contrast, they speculate that it relocated to the to the next drainage to the south. I think first they they thought it relocated to the top of the drainage on the ridge line. And then after logging and abandoned that nest, it went further south into an unlocked drainage. And but they haven't I believe that they haven't even seen any foraging in the bulls run territory or drainage. I'm sorry. So what they did basically was just say, well, the drain of the territory is bigger than that drainage. And we still have seen goshawks in that territory. So therefore, no impact. Unfortunately, that is speculation because the the nest that they speculate they relocated to is in an area that had never been monitored before. So there's it's equally plausible that that nest actually existed before and was occupied before logging and that the bulls run. Goshawks were extirpated just as a sweats gulch. I guess the question is, if you have a determination that these are not threatened or endangered, the fact that there might be some shifting, but not but that there is evidence that the population is being maintained to some degree. Does that somehow make it arbitrary and capricious? Actually, actually, what the cumulative analysis said is that they're in the cumulative analysis area, which is about 50000 acres. There is like seven potential goshawks territories, which are about 6000 acres, two of which were eliminated in another fire. Previous fire. And then one. And then arguably one of which was eliminated through the sweats gulch or bull run sweats project. That would be the sweats gulch. And then the other the other. So. So basically what the cumulative analysis found was that there were out of the seven potential territories, there were still three that could potentially be occupied of those three. Two of them are known to be occupied. And of those two, only the gym town goshawks are actually producing offspring. I should say are the only ones known to be producing offspring. The gym town ones, the ones that nest 150 yards outside the project. The ones we're talking about right through the nest stand. And then they move the boundary just to the so that they excluded the nest stand. However, they've never delineated the post post fledgling family area, which is about a square mile area that's critical for survival of the and it requires. So it's not clear. In other words, when they move the boundary to the to the nest stands order. What effect on the PFA, which is critical information to know whether it's going to be able to continue to support offspring. So and then the other then second response to your question on sort of what is the significance of losing one or three. I mean, I know the objective significance, but I'm wondering in terms of the context of this project and what they're proposing to do. Well, unfortunately, there's never been any forest wide assessment of goshawk viability for the Helena National Forest. So, you know, we can draw conclusions from the record before the court, but there's no forest service experts analysis of whether there is even a viable population of goshawks in the Helena. Our position based on, you know, in the absence of that analysis, our position is that there is good reason that we don't we haven't seen that analysis because we don't think it is a viable population. It appears to be limited to six. I think the forest service argued eight productive nests or were actually not even productive, but active nest, a productive nest is one that actually produces offspring. But active nests in the entire forest, which is about a million acres, which works out to about one active nest every 250 square miles. Well, what what do you make of this report that I guess every maybe the only thing I think I can find that the parties agree on. And that is that the Reynolds Mr. Reynolds is an expert of of considerable repute and that his report in and of itself is not really an issue. But if you take his report and the Forest Service then applies it, what's what is the issue then? Well, the issue is that they they don't tell us if they're the project is consistent with the recommendations from Reynolds, such as minimum canopy closure in the project area or I'm sorry, in the goshawk territory on on on the entire goshawk territory. Reynolds says should have about 40 percent canopy closure. And in the PFA, the post-fledging family area, it needs to be about 60 percent. Reynolds also says there needs to be 60 percent older forests in the goshawks territory. We know that in this case, that's simply not true because there's no growth in that area. So that that raises an interesting point, which requires further analysis, which is here you have a productive goshawks that don't have the normal balance of forest age structures that you would expect. And so therefore, it is likely, according to other studies out there, that that it needs greater canopy closure. In other words, more density of the mature forest rather than relying on. Is that part of it? Are you relying now on this five year report? I'm sorry. Are you referencing now the five year report discussion or something else? Actually, I'm actually not. And it's actually analysis that you won't find in the record. In this case is the issue that was raised by Dr. Johnson, I guess. OK, well, see, that's the problem. I'm you know, I'm sitting here trying to we have enough issues as we do. Yeah. But then you add another one that isn't in the record. Well, and it's not only confusing, but, you know, it's improper, it seems to me. I'm sorry. It is in the record. The studies are not in the record, but they're referenced in Dr. Johnson's comments, which were consistently before the Forest Service and her basically saying, you know, basically what she said is that it appears that this is not the best quality habitat. And since you don't have the older forest component, then isn't it necessary to have higher density or higher canopy closures? And she did her own analysis since the Forest Service hadn't done it on canopy closure and so forth. And the effects of logging and fire on that closure of canopy closure. And so just to get your point, her studies are not in the record, but her challenge is. Is that correct? I believe that she raised her studies. I think she was referencing other studies from the Targhee National Forest. The question is, is the fact that she raised a question about whether the Forest Service analysis was complete enough, whether the fact that they didn't respond or didn't respond adequately is an abuse of discretion. Is that the question? Well, no, actually, in the context of an EA, you know, what she was saying was she was raising substantial questions about goshawk viability that required preparation of an EIS. And that was her from the start. She disagreed strongly with their experts' conclusions in the Helena National Forest about goshawks. And so it's the type of issues that she raised would need preparation of an environmental impact statement in order to be addressed. And the gist of it is that we don't have any old growth forest here. So what is needed? So we don't know what's needed because they like old growth, but we don't have any. I mean, it just seems to me that that gets me on this merry-go-round, so I'm having a little trouble understanding. I mean, I understand the argument here, but I'm having trouble understanding how far the Forest Service has to go when you have an area with stands that aren't old growth. They can't they're trying to enhance and maybe down the road create them, but they can't instantaneously make old growth. Well, yeah, and this is not an old growth enhancement project. Well, so what's your complaint then? They're not ensuring the viability of the northern goshawk because regardless of whether there's enough old growth or as much old growth as would be recommended in that area, you have a productive goshawk nest that has reproduced fledglings and is doing just fine. And so if anything else, it should be studied. And the other thing that Dr. Reynolds points out for ensuring goshawk viability is that if you have a productive nest, every one of those is valuable because of the uncertainty associated with the impacts of thinning on the prey base. You know, we don't have any way of knowing whether there's, you know, at what point does the prey base get reduced? Will the goshawk stop reproducing?  In certain, yeah, in the context of. You don't have Reynolds and Johnson at war with each other basically, no? No. Reynolds talks about the use of thinning in the context of a well-balanced forest with 20 percent old growth and 20 percent mid-age forest. We don't have that here. So in this case, you know, the idea that thinning can be beneficial, you know, is highly. In this case, I don't think that applies. And you say it doesn't apply and that your basis for that is Dr. Johnson or something else? Yes. And Dr. Johnson is a very well-qualified expert on goshawk viability. What the Forest Service says is necessary is to reduce stand replacement fires. Now, I think that's a laudable goal. And how do we second guess that determination on their part? Well, it's fine for the Forest Service to have an overall plan, I suppose, to reduce stand replacing wildfires, although in the northern Rockies, those are the very type of wildfires in which this habitat has developed. But if they're going to implement that kind of a policy, then they need to do it in a way that accounts for species impacts. In other words, Your Honor, just to say we don't want old growth to burn, so therefore we're going to go log it all and thin it all out. Well, if you apply that kind of logic on a forest-wide basis, then you're not going to have any more old growth species inhabiting that old growth habitat. So the question is just how they balance their policy favoring reducing stand replacing wildfires with the needs of the species. And in this particular case, we would know that they haven't because they haven't even analyzed the impacts on the species. What effect is the fact that this is designated actually a forager area and not really subject to forest management? What do we do with that decision? Yeah, there are certainly an issue concerning whether any kind of commercial logging would be suitable or appropriate in this area. I think, you know, that issue, if anything, might be another factor mitigating in favor of an environmental impact statement since they're not complying with their forest plan. Is that a question of terminology? Because the fact that you have, if it's not part of sustainable yield, so it's not part of the commercial, isn't that different from saying if you go in and you thin, but within the thinning you have logs that have some commercial viability, then of course you want to get the money. So aren't we talking apples and oranges here? Yeah, I don't think it's a compelling issue, to be honest with you. Just to clarify, you made a motion to add the five-year report to the record. Was that in this case or the other Helena Forest case or both of them? Because there was some ambiguity in the documents that I saw. Yeah, with the recent, the amended briefs and amended excerpts of record, I believe, mooted our motion. So if it didn't, we would withdraw the motion in this case to supplement the record with the five-year report because unlike the other case, the report was not included in the record before the decision-maker and I just felt like it complicated the issues too much. So I think that to me ---- And when did you decide to withdraw this motion? Is that clear? When I resubmitted the briefs and pulled the report out of the excerpts of record. So the amended excerpts of record don't include that report. I understand. But that's because we ordered you to write a brief that included only the record, but it wasn't clear whether you had still had your motion pending. I'll withdraw that motion right now. What about your motion with respect to the observation chart? That's all information that was before the decision-maker. And so it's basically demonstrative. Okay. So let's start. Is that motion pending in this case? I included ---- I didn't include that document in the excerpts of record. I included it as an appendix to the brief, as basically a convenient tabulation of information that was before the decision-maker. So it's basically a demonstrative evidence that was included for the Court's easy reference, because those ---- all of the information, that's a very nice sort of tabulation of the information that's scattered throughout the record. So it was just easier, I felt, for the Court to get a picture of what was going on from that. Well, I guess I thought it was part of the motion to supplement. So you're now saying it's not a motion to supplement, and we should just determine if we would just consider it as demonstrative evidence based on evidence in the record? Yes. Everything in that document is included in the record. Getting back to your 5-year report, now I understand you're not moving it be considered in this case you're arguing right this minute, right? That's correct. Okay. But are you moving it be considered in the other Helena Forrest case? Yes. And does the observation chart figure at all in the next case? Yes. And I think the only distinction is ---- Is it part of the motion to supplement the record in that case? No. I think I handled it the same way. I'm not sure if it was actually part of the record in the next case or not. I don't think so. But I believe ---- Well, that would make a difference based on your logic in this case. If it's part of the record in this case and is simply a compilation of evidence in the record, that's one thing. But if in the second case, the one involving the Elkhorn Project, it's not part of the record, then it can't really be a cumulative demonstrative exhibit, can it? In the Elkhorn case, it's the same. All the information was before the decision-maker except for the last year, the last column, the last updated information. So basically, I think it covers about eight years and ---- And that comes after the supplemental information report? That last column is after any supplemental information that's in the record? Yes, in this case, but not in the next one. All right. We'll hear from the government.  Thank you. Before you begin, my understanding is that there is no motion, or the motion is withdrawn on the five-year report in this case, the Chimtown Project case, and that counsel takes the position that the observation chart is in the nature of demonstrative, descriptive evidence that's already in the record. Thank you. Thank you, Your Honor. Just in response to that point, the government has no objection to the Court's consideration of that chart as demonstrative evidence. It does, however, contain information that is too late to have been part of the record for any part of this case. It was an update of a compilation, a similar compilation that was made in conjunction with the supplemental information report prepared by the Forest Service after the 2003 fire, after the Chimtown fire. And as a consequence, I don't think it is accurate to say that it merely compiles information that was before the decision-maker at any decision point, but it is useful data if the Court intends to do what Native Ecosystems apparently seeks to have it do, which is to substitute its scientific judgment for that of the Forest Service. So I guess there's at least two things you agree on in this case, the Reynolds report and that we can look at that observation chart. We do not object to looking at it. We do not recommend it because we believe that unless this record shows that the Forest Service did some considerations or made a clear error of judgment, this Court needs to affirm what the Forest Service did here on the record, rather than going back and reanalyzing the data that the Forest Service experts relied on, which is what Native Ecosystems is urging that the Court do here. As I understand it, the Forest Service relies on an EIS for some area which is supposed to be substantially similar. Is that right? That is correct, Your Honor. At least the project that was conducted in that area, which is not far distant from this project, was substantially identical. And that EIS accordingly was incorporated within the environmental review for this project, along with the very detailed EA that was done for this project. And in addition, because of the later need to do a supplemental information report, because of a large and intense fire that burned portions of the project area here, the Forest Service was able to bring in field data from the area in which that project was conducted that showed that the goshawk resident in that area remained resident in the ranges that they had occupied before the thinning project there, which was not necessary for the decision here, but did affirm that the judgment here was appropriate. What about the argument that I understood the Native Ecosystems to make with respect to the post-fledgling family area? In other words, you've got the nest, and you've got foraging, but between there is this some area, I think he said one square mile. Is that considered in the EA, and how is that figured in? The post-fledgling area at need of the goshawks clearly is considered in some detail in the EA and in the studies that the EA was based on. What I believe Native Ecosystems is saying in its reply brief in this case is that in response to a comment on the EA, the Forest Service suggested that portions of the project area might be useful to goshawks as foraging or as PFA habitat. And in later analysis, the Forest Service argues that this area has not been used as a PFA area for the goshawks nesting nearest the project, the Jimtown goshawks. Those two statements are not inconsistent. What the comment said was that this is in the vicinity of the nest, such that it could be a part of the PFA for that nest. Field studies show that juvenile goshawks have not used any part of the Jimtown area as PFA, and that's probably because the structure of that area is not ideal PFA habitat. What they have used instead is within the nest stand, and all of that is entirely consistent with the science on goshawk habitat and behavior. There are other nest stands or potential nest stands within this goshawk's home range, and those areas would also provide high-quality PFA areas. So you're basically saying these field studies show that they stay home, so to speak? That's correct, Your Honor. This case illustrates why lawyers and judges aren't the best people to make the decisions that the Forest Service is forced to make in these circumstances, because if you were to look only at the Reynolds report and draw the circles that Reynolds would suggest around the nest and around PFA, you would find that the area that these goshawks are nesting in is completely inadequate. These goshawks are nesting in an area that doesn't fit all of the precise criteria of the Reynolds report, and for that reason, the Forest Service had to verify all of its findings about what the goshawks need, use, and do in this area with field studies. Ms. Johnson appears to have taken the opposite approach and said, you can't do this because there isn't sufficient canopy closure here. Goshawks can't live here if you change that. Well, goshawks can live there because they do live there, and what we've found is that in other areas similar to this, including two small areas immediately within this goshawk's home range, the private Bowers property and an earlier firebreak project on Jimtown Road, which are both referenced in the response to comments that's in the excerpts of record at page 183, were thinned, both of those areas were thinned within this goshawk's home range, and this goshawk has remained resident in this area. All of the evidence, therefore, is that while possibly not ideal habitat, not idealized, not what Reynolds would ideally recommend for goshawk, this is suitable habitat. It is supporting productive goshawk, and there is no reason to believe that the small thinning project here would affect those goshawks' behavior in any way. And I would like to correct a few of the statements that were made this morning just to make sure there's a clear understanding about what the Forest Service found here. To begin, there is no dispute that impacts will occur from this project on goshawk habitat. There is no finding anywhere in the record that those impacts will be adverse, although the Forest Service treated them as though they might be negative impacts and determined that even if they were, the resident pair of goshawks in this area would be unaffected because of the availability of suitable habitat in excess of the recommended 5,820 acres, I believe, in its home range. The idea that the Forest Service needed to disclose the components of the canopy closure here because canopy closure is so critical to goshawk habitat is also, I think, a little confusing or possibly misleading in that goshawks forage throughout a wide variety of forest types, including more open areas, and these goshawks have successfully occupied an area that doesn't have all of the recommended canopy closures that the Reynolds report would suggest are ideal for goshawk habitat. So what the Forest Service has done instead is to determine that there is in excess of the recommended amount of as good or more suitable habitat within these goshawks' home range and determined that, therefore, even if thinning would reduce the quality of foraging habitat on the few acres that will be changed in this goshawk's home range, viability of this home range as habitat for goshawks will not be adversely affected. There is no suggestion in the record that the abundance of prey for goshawks will be reduced by the project, nor is there any evidence in any of the studies or in the record anywhere that goshawks prey primarily on red squirrels. Red squirrels are the one goshawk prey species that is likely to be reduced in abundance in the project area as a result of thinning, but there are five goshawk prey species that are likely to increase in the area also, and the record is very clear on that in the wildlife section of the EA. Okay. There is no evidence anywhere in the record that thinning has ever extirpated any goshawk from any territory. The Forest Service, excuse me, interprets its own data to indicate that, in fact, thinning has not affected the behavior of any of the goshawks monitored on the forest. And I would also like to correct the suggestion. I believe Mr. Woodbury suggested that the northern Rockies is kept in the ecosystem of the northern Rockies is kept in balance by a periodic catastrophic fire. This forest type, this dry forest type that the Helena falls within, is not kept in balance by periodic catastrophic fire. The reason we're having catastrophic fires is because the forest, as the EA explains, has been taken out of balance after so many years of fire suppression and other management on the forest. And, in fact, in its natural condition, a balanced forest would have periodic lower intensity fires that would not be stand replacing and would be an open savanna type forest for the most part. Could I just go back to something you mentioned earlier, and that has to do with Reynolds and these concentric circles coming out? Are you saying, then, that even though that might be an ideal situation, that field observations show that things don't need to occur in that kind of a uniform process in terms of the habitat availability? I am saying that to a degree, Your Honor. I'm saying that, in fact, this successful supportive habitat doesn't quite match what Reynolds says. And I think we are in agreement on that as well. I think we found three things. But for that reason, for example, this demand that the Forest Service delineate the post-fledging family area appears to be a suggestion that it find the recommended number of acres of appropriate habitat for post-fledging family area here. There may not be that quantity of habitat. These goshawks have managed and successfully fledged in an area that doesn't have the canopy closure characteristics that would be ideal for goshawks under the Reynolds study, but have made do with, as you say, staying home and using the nest stand as PFA as well. So would this mean that your argument is that the existence of habitat that is supporting the species is sufficient for answering this question about whether there's extirpation or degradement of habitat? No, no. The factors that went into the determination that the habitat would not be degraded in such a way as to render this home range unsuitable included the studies of prey abundance and so on. All that I'm saying when I refer to the qualities of the specific habitat here versus the idealized habitat described in the Reynolds report is that we use the Reynolds report as guidance, and then we verify on the ground what, in fact, is necessary and what, in fact, is used and needed by the species that are present. And in this case, when Ms. Johnson went out and found that the canopy closure was inadequate, that was true before and after thinning. We wouldn't be thinning any good goshawk habitat here. And under the standard that she applied, a great deal more of the habitat that is occupied would also not be ideal goshawk habitat. But it is used. But they live there. But they live there nonetheless. They live there, and they have successfully fledged there. And all of the science we have, which essentially is the best science available, suggests that nothing in the project will cause that habitat to become unsuitable or adversely affect this goshawk pair. And if it doesn't adversely affect viability of this home range, doesn't affect adversely the viability of this goshawk pair, it cannot affect the viability of goshawks on the forest as a whole. Now, what is the evidence of the little critters that the goshawk preys on? You say it will affect the squirrels, but is there positive evidence that it's not going to affect the gophers and the other things? Yes, Your Honor, there is. In the record at ‑‑ well, in the supplemental excerpts that we filed at pages 17 to 22, you'll find the wildlife report that was done for this project and for the EA here. And what it shows is that a number of species will benefit from the opening up of this small area of the forest and are likely to become more abundant, and five of those are goshawk prey species. Red squirrels prefer a very deep forest habitat and therefore are likely to become less abundant in this area as it opens up, and they are one of the preferred species for goshawk prey, and the EA reveals that as well. If the panel has no further questions, I'll just yield the rest of my time. Thank you. I think you're way under your time, but we'll give you another minute or way over your time. Just two quick points. The EIS for the bull's run was prepared under the salvage rider, so there was never any opportunity to actually challenge any of the conclusions in that study and it hasn't been supplemented. And there's no ‑‑ the counsel says there's no reason to believe that thinning would impact the Jim Tong goshawks in any way. That's simply contrary to science and the findings in the biological evaluation. Thinning does impact goshawks by reducing prey abundance. There will be a sharp decline in red squirrel abundance, according to Reynolds, red squirrel. In a goshawk, typical goshawk diet, does the record tell us what percentage of that diet is red squirrel? Is that something nobody knows? No. Certainly the record doesn't know, I suppose. In the Reynolds study, he has ‑‑ he identifies, I believe, it's eight primary prey species, of which the red squirrel is one, and I don't think any of the other primary prey species are in the project area, so the red squirrel would be the one of greatest concern. We don't know what the density or abundance is now or what it would be after the project, but it definitely would have been reduced by the recent fire and previous fires and previous thinning projects, if you look at the photographs. And the problem, you know, is the more you ‑‑ the red squirrels require trees with interlocking crown to go from, to live in the canopy, I guess, and basically thinning eliminates that, and so it isolates them. You put goshawks on a no red squirrel diet. Vegetarian goshawks. What outbreak effect does it have on them? Well, the other problem. The question is the answer. The record doesn't tell us that. It doesn't. And the other thing ‑‑ Okay, thank you. I think you've answered the question, and we're well over your time. I appreciate that. All right, so we will now conclude with this argument in the case of Native Ecosystems versus the Forest Service will be submitted.
judges: B. Fletcher, McKeown, Gould